IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| BETHANY NIMAN, et al., | CV 23–79–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| CLAYTON CHRISTIAN, et al., | |
| Defendants. | |

Plaintiffs are students and former students who enrolled in professional degree programs at the University of Montana–Missoula ("UM") that were classified as non-resident students for the purposes of their tuition and fees. They have sued the Montana Commissioner of Higher Education Clayton Christian, as well as individual members of the Montana Board of Regents and UM registrars, (collectively, "Defendants"), alleging civil rights violations under 42 U.S.C. §§ 1983 and 1988 based on a residency policy that denies bona fide residents of Montana in-state tuition at its universities. (Doc. 1.) Both parties have moved for summary judgment. (Docs. 36, 39.) A motion hearing was held on November 22, 2024.[1] Summary judgment is granted in favor of Defendants.

---

[1] That hearing also addressed class certification, which was denied. (*See* Doc. 51.)

**BACKGROUND**[2]

## I.    The Residency Policy

Montana Board of Regents of Higher Education Residency Policy 940.1 (the "Policy") prescribes the procedure for determining the in-state or out-of-state classification of applicants for admission at the campuses of the Montana University System. (*See* Docs. 15-1, 15-2.)  Generally, students may only be classified as in-state after providing documentation that they have been domiciled in Montana for at least 12 consecutive months. (*See* Doc. 15-2 at 1.) "Domicile requires both physical presence and evidence of intent to stay," and "[e]vidence of intent to stay includes relinquishing all valid legal ties with a former state of residence and affirmatively creating legal ties and relationships with Montana." (*Id.*)  The Policy requires specific connections to Montana that must be established at least 12 consecutive months before the term for which the student is seeking in-state status.  Establishing these requirements can include registering a motor vehicle in Montana, getting a Montana driver's license, and registering to vote in Montana. (*Id.*)  The Policy contains additional requirements for in-state students who claim financial independence from out-of-state income, which requires they receive "less than 50% of all income and financial support from" out-of-state and

---

[2] The facts are undisputed unless otherwise noted. (*See* Docs. 37, 41, 45, 48.)

pay for "the majority of their expenses (including the cost of attendance and room/board) with their own independent income and resources." (*Id.* at 2.)

When considering evidence for residency classification, the Policy applies several presumptions, one is that an individual cannot establish residency for tuition purposes while registered for more than half of a full-time credit load because such a presence is considered "primarily for educational purposes." (*Id.* at 3.) "A presumption can be overcome with clear and convincing evidence, which is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." (*Id.*) A student classified as a non-resident remains a non-resident unless the student successfully petitions for reclassification. (*Id.* at 5.) A student adversely affected by the final decision of a relevant campus may appeal the decision to the Commissioner of Higher Education, and the Commissioner's decision may be appealed to the Board of Regents. (*See* Doc. 15-4.) No hearing is required on appeal. (*Id.* at 2.)

The Policy contains specific provisions governing the classification of professional degree program students—i.e., students enrolled in a program of law, pharmacy, or physical therapy. Prior to July 2023, Rule 940.1(H) provided in relevant part:

> An out-of-state student admitted to a professional degree program is not eligible for reclassification as an in-state resident and shall remain classified as an out-of-state student for the duration of the student's enrollment in the professional degree program. A student classified as

3

> out-of-state who maintains the initial classification was in error may
> only seek reclassification pursuant to the procedures of this policy prior
> to the start time of the initial term of enrollment or matriculation into
> the program.

(Doc. 15-1 at 3–4.)  This language was amended in July 2023, and now reads:

> To be eligible for in-state status, a student admitted to a professional
> degree program must meet the standards set forth in subsection C-E
> [described above at 2–3].  In addition, the student must have maintained
> a primary residence in Montana for at least 12 consecutive months
> immediately before the student's first admitted semester.  The Montana
> residence must be for the purposes other than postsecondary education.
> If the student took more than 7 credits (or more than 8 credits on a block
> schedule) at an institution of higher education during the 12-month
> period, the student must prove by clear and convincing evidence that
> the student has a Montana residence for reasons other than
> postsecondary education.  This subsection does not apply to students
> who can demonstrate previous Montana residency under this policy and
> who have not abandoned residency.  For the purposes of this section,
> the term "professional degree program" means a program of law,
> pharmacy, or physical therapy.

(Doc. 15-2 at 3 (Rule 940.1(G)).)  Unless specifically distinguished in context,

these provisions are referred to as the "professional student provisions" below.

## II.    Plaintiffs

Plaintiffs are nine former students of UM that were enrolled in a

professional degree program.  With the exception of one Plaintiff, who read the

Policy and decided against applying for reclassification, Plaintiffs claim that,

although they were "bona fide" residents of Montana, they were denied in-state

resident status reclassification based on one or more of the following allegedly

unconstitutional requirements: (1) the 12-month waiting period; (2) the pursuit of a

4

professional degree; (3) the credit load presumption; or (4) financial dependence on an out-of-state source. Plaintiffs also claim they were charged out-of-state tuition disproportionate to the funding provided by Montana taxpayers. All nine Plaintiffs have graduated, (*see* Doc. 32-18 at 2), and all but one either live or work outside Montana. Plaintiffs are discussed individually below.

### A.    Bethany Niman (Law)

Niman moved from Oklahoma to Montana in July 2021 and began law school at UM in August 2021. (Doc. 32-2 at 12–13.) While Niman had applied to numerous law schools in the West, she specifically wanted to move to, and live in, Montana. (*Id.* at 15–16.) Niman attended law school at UM in 2021, 2022, and 2023, graduating in December 2023. (*Id.* at 16–17.) While Niman testified in her deposition that all through school she intended to live in Montana once she graduated, (*id.* at 17), she attempted to transfer law schools after her first year, (*id.* at 26; Doc. 32-17 at 11). Niman maintains, however, that she would have returned to Montana after school. (*See* Doc. 32-2 at 28–29.) Niman did not register to vote in Montana until April 2022. (*Id.* at 44; Doc. 32-3 at 2.) She worked in Montana while in law school, (Doc. 32-2 at 33–34), and filed taxes in Montana, (*id.* at 43), but following her graduation in December 2023, applied for legal jobs primarily outside Montana, (*id.* at 35–40; *see* Doc. 32-3 at 3–16 (Indeed application list)). While Niman currently resides in Montana and plans to continue to do so, (Doc.

5

32-2 at 49), she works as a deputy prosecutor in Bonneville County, Idaho on a one-year contract, (*see id.* at 11; *see* Doc. 34-2 at 2).

While in school, Niman unsuccessfully sought reclassification twice; once in April 2022 and again in July 2022. (*See* Doc. 37-1 at 15–21.) She attempted to appeal at least one of those decisions to the Board. (*See id.* at 19.)

## B.    Riley Bennett (Physical Therapy)

Bennett came to Montana from South Dakota as a physical therapy student in August 2021. (*See* Doc. 32-4 at 12–13.) He applied to five different physical therapy graduate programs across the West and ultimately moved here "for PT school," (*id.* at 11–12), though that was not the only reason, (*id.* at 23). During his time in Montana, he worked remotely for his father's South Dakota company, and his wife worked as a nurse at the local hospital. (*Id.* at 13–15.) They unsuccessfully attempted to buy a home. (*Id.* at 14.) In 2021, Bennett registered to vote, registered a vehicle, got a Montana driver's license, and paid Montana taxes. (*See* Doc. 45-2.) After graduating in May 2024, (Doc. 32-4 at 13), Bennett became licensed as a physical therapist in Montana, (*id.* at 18), and took a part-time job in Florence, Montana for two months, (*id.* at 9, 14). Bennett then left that job due to the "[c]ost of living," (*id.* at 14), and only sought jobs in Nebraska, citing financial necessity and the fact his wife's family lives there, (*id.* at 10, 16–17). More specifically, Bennett noted financial needs arising out of the birth of his second

child, his wife's transition to a stay-at-home mom, and the need to repay his out-of-state student loans. (*Id.* at 17, 24.)

While in school, Bennett unsuccessfully sought reclassification twice, once in 2022 and again in 2023. (*See* Docs. 37-1 at 22–24, 45-2 at 1.) He attempted to appeal at least one of those decisions to the Board. (*See* Doc. 45-3 at 1.)

### C.    Jora Bolena (Pharmacy)

Bolena is from, and currently lives in, Spokane, Washington where he moved for work in July 2023 after graduating from the UM pharmacy program. (Doc. 32-5 at 9–10, 12.) Bolena moved to Missoula and enrolled at UM in August 2018. (*Id.* at 11.) UM was the only school he applied to, (*id.* at 15), and he attended one year of undergraduate at UM before starting in the pharmacy program, (*id.* at 13). Bolena admitted that during school he was not sure where he permanently intended to reside but would have accepted a position in Montana if offered. (*Id.* at 15, 19, 39, 43–45.) He did not, however, apply to any positions in Montana after he graduated. (*Id.* at 15–16.) Bolena specifically wanted to return to Spokane because his family is there. (*Id.* at 17.) While Bolena got a Montana driver's license in January 2022, (*id.* at 35–36), he never registered his vehicle in Montana, (*id.* at 33–34), or registered to vote in Montana, (*id.* at 35). He holds a professional license in Washington, (*id.* at 37), and has a business registered in Washington, (*id.* at 38). Bolena's parents, who reside in Spokane, also paid more

7

than half of Bolena's expenses, including tuition, while he was in school. (*Id.* at 36.)

It is unclear from the current record when Bolena petitioned for reclassification and whether he appealed that decision to either the Commissioner or the Board.

### D.    Kasey Calwell (Physical Therapy)

Calwell moved to Montana from California (via Colorado) in August 2020 and then moved to Oregon in January 2023, although he did not graduate from the physical therapy program until May 2023. (Doc. 32-17 at 5, 15; Doc. 34-5 at 9–10, 14–15, 17, 25.) He was absent from Montana for extended periods during this timeframe. (Doc. 32-17 at 8.) While he applied to numerous schools, he was only accepted at UM. (*Id.* at 10.) Calwell obtained a Montana driver's license in 2021, registered to vote in Montana in 2020, registered a vehicle in Montana in 2021, and filed a Montana tax return in 2020. (*Id.* at 12–13, 20.) He was claimed on someone else's tax return during this period. (*Id.* at 24.) Calwell testified in his deposition that he moved to Montana for numerous reasons, including the fact he "wanted to pursue PT school." (Doc. 34-5 at 15.)

While in school, Calwell unsuccessfully sought reclassification at least once, in 2022. (*See* Dos. 37-1 at 25–27.) He appealed that decision to the Commissioner, but it is unclear whether he attempted to appeal to the Board.

8

### E.    Ursula Casey (Physical Therapy)

Casey moved to Montana in August 2020 from Bellingham, Washington and returned to Bellingham after she graduated in June 2023.  (Doc. 32-8 at 10–12, 22.) While she applied for several physical therapy graduate programs, (*id.* at 13), Casey ultimately moved to Montana for "[g]rad school and the town and outdoors," (*id.* at 12).  Casey indicated that she would not have moved to Montana if she had not been accepted for school.  (*Id.* at 47.)  During school, Casey maintains she intended to remain in Montana, (*id.* at 24–25), but she and her partner considered living in either Missoula or Bellingham afterwards, (*id.* at 15, 28, 44), and following her graduation, she applied to only one job, her present job in Washington, (*id.* at 14).  Casey did not get a Montana driver's license but did register her vehicle in Montana and register to vote in Montana.  (*Id.* at 33.)  Her professional license is out of Washington.  (*Id.* at 34.)

While in school, Casey unsuccessfully sought reclassification at least once, in 2022.  (*See* Dos. 37-1 at 28–30.)  She appealed that decision to the Commissioner, but it is unclear whether she attempted to appeal to the Board.

### F.    Brian Hagan (Law)

Hagan lived in Montana from July 2020 to June 2023.  (Doc. 32-10 at 10.) When Hagan moved to Montana, he severed ties to his former residence in Alabama and got a Montana driver's license, registered to vote in Montana,

registered a vehicle in Montana, got his CPA license in Montana, and was ultimately barred in Montana. (*Id.* at 30–32, 34.) He matriculated at UM Law in August 2020 and graduated in May 2023. (*Id.* at 11–12.) Initially, Hagan intended to make Montana his permanent home, but he became unsure of that fact at the beginning of his second year of law school. (*Id.* at 21.) At that point, he intended to live anywhere he could obtain a federal clerkship. (*Id.* at 22–26.) During law school, he applied for clerkship jobs with judges all over the country, including judges in Montana. (*Id.* at 13, 16–18.) After graduation, Hagan began a two-year position as a law clerk for a federal magistrate judge in South Dakota. (*Id.* at 9.) Hagan would like to continue clerking after his current position ends in 2025, and he has submitted numerous clerkship applications but not to any judges in Montana. (*Id.* at 18–19, 26.)

Hagan never sought reclassification. (*Id.* at 34; Doc. 32-17 at 20–21.)

### G.    Miranda Starr (Physical Therapy)

Starr moved to Montana from Oregon in August 2020. (Doc. 32-12 at 12.) Starr is now licensed in physical therapy in Oregon, (*id.* at 11–12), and moved to Oregon for her clinical in January 2023, (*id.* at 12, 14) and remained there following her graduation in May 2023, (*id.* at 10). She applied to several physical therapy programs in the West, (*id.* at 14), but after school only looked for employment in Oregon, (*id.* at 16). Starr's parents, who reside in Oregon, paid her

10

expenses while she was in school. (*Id.* at 34–35.) She got a Montana's driver's license, (*id.* at 35), registered to vote in Montana, (*id.* at 35–36), and registered her vehicle in Montana, (*id.* at 37). She did so, however, in order to seek reclassification. (*Id.* at 38.) Starr maintains, however, that school was not the only reason she came to Montana and that it was largely her job prospects that drew her away again. (*Id.* at 39–40.)

While in school, Starr unsuccessfully sought reclassification at least once, in 2022. (*See* Dos. 37-1 at 31–33.) She appealed that decision to the Commissioner, but it is unclear whether she attempted to appeal to the Board.

### H.   Elizabeth Vicencio (Law)

Vicencio moved to Montana from California in August 2020. (Doc. 32-13 at 11.) She applied to several law schools before choosing Montana. (*Id.* at 13.) Vicencio was receiving unemployment benefits from the state of California up until July 17, 2021. (*Id.* at 20.) She registered her vehicle in Montana in March 2021, (*id.* at 22–23), and got a Montana driver's license in June 2023, (*id.* at 24). Following her graduation in May 2024 she only applied for jobs in Montana, (*id.* at 28), and Vicencio currently lives in Bozeman, Montana and works for the Office of the Public Defender, (*id.* at 10, 15).

While in school, Vicencio unsuccessfully sought reclassification at least once, in 2022. (*See* Dos. 37-1 at 34–36.) She appealed that decision to the Commissioner, but it is unclear whether she attempted to appeal to the Board.

## I.    Madison Ward Puryear (Pharmacy)

Ward is from Spokane and her family still lives there. (Doc. 32-15 at 10.) She currently lives near Spokane and works as a pharmacist in a position she started upon graduating in June 2023. (*Id.* at 11.) Ward moved to Montana in August 2017 as an undergraduate, ultimately graduating from the pharmacy program in May 2023. (*Id.* at 13–14, 16.) Ward attended a year of classes remotely from Washington. (*Id.* at 16.) Ward also returned to Spokane often during her education, because "Spokane was home." (*Id.* at 20–22.) All of Ward's summer jobs were in Spokane. (*Id.* at 32, 34, 46–47.) After graduation, she only applied for jobs in the Spokane area. (*Id.* at 24.) For her tax 2021 and 2022 tax returns, Ward listed Spokane as her home address, (*id.* at 28–29, 43; *see* Doc. 32-16), and her parents paid her tuition and most of her expenses while she was in school, (Doc. 32-15 at 34–35). Her parents also listed her as a dependent on their tax returns. (*Id.* at 35.) Ward got a Montana's driver's license in September 2022, but she admits it was in order to qualify for in-state tuition. (*Id.* at 35–36, 41–42.) She registered to vote in Montana but did not register a vehicle in Montana. (*Id.* at 36–37.) She holds an Idaho pharmacy license. (*Id.* at 38.) Ward testified in her

deposition that she chose Montana for reasons other than school, including "the location and the town itself." (*Id.* at 51.)  She also testified that she had "intentions to stay," that changed over time, at least partially due to financial considerations. (*Id.* at 52, 59.)  She would not, however, have moved to Montana had she not been going to school here.  (*Id.* at 62.)

While in school, Ward unsuccessfully sought reclassification at least once, in 2022.  (*See* Dos. 37-1 at 37–39.)  She appealed that decision to the Commissioner, but it is unclear whether she attempted to appeal to the Board.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered.  *Id.* at 248.

## ANALYSIS

The crux of Plaintiffs' case is their claim that Defendants enacted and enforced an unlawful presumption of out-of-state residency status in contravention

13

of *Vlandis v. Kline*, 412 U.S. 441 (1973).  Plaintiffs seek partial summary judgment, asking the Court to declare that the residency and professional student provisions of the Montana University System violate Plaintiffs' Fourteenth Amendment rights to due process and equal protection, and the right to travel. (Doc. 36.)  Defendants also seek summary judgment, arguing that they should prevail on all of Plaintiffs' claims because Plaintiffs lack standing, Defendants are entitled to qualified immunity, and the professional student provisions, as well as the other residency requirements, are constitutional.  (Doc. 39.)  Defendants are mostly right.  Plaintiffs are mostly wrong.  Because all Plaintiffs have graduated, they lack standing to pursue their claims for injunctive or declaratory relief. Plaintiffs' facial challenges were previously dismissed.  (*See* Doc. 20 at 13.)  Only Plaintiffs' as-applied constitutional challenges are considered on the merits.  Those challenges fail because, as applied to Plaintiffs, Defendants did not rely on an unconstitutional metric or irrebuttable presumption to deny any of them in-state residency status.

## I.      Standing

To have Article III standing, a plaintiff must allege: (1) an injury-in-fact (2) that is "fairly traceable to the challenged action of the defendant" and (3) "likely" to be redressable by a favorable decision.  *Fellowship of Christian Athletes v. San Jose Uni. Sch. Dist. Bd. of Edu.*, 82 F.4th 664, 680 (9th Cir. 2023)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "[P]laintiffs must demonstrate standing for each claim they press and for each form of relief they seek (for example, injunctive relief and damages)."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Defendants argue that Plaintiffs lack standing to seek injunctive or declaratory relief because they have graduated.  Defendants also argue that Plaintiffs lack standing to pursue damages because the professional student provisions were not the cause of their alleged constitutional injury, and that Plaintiff Hagan lacks standing because he never sought reclassification.  With the exception of their damages argument, Defendants are correct.

## A.    Injunctive and Declaratory Relief

To have standing to obtain injunctive relief, a plaintiff must show "a sufficient likelihood" that he will suffer a "future injury."  *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).  Here, it is undisputed that every Plaintiff has graduated from the Montana University System.  (*See* Doc. 32-18 at ¶ 3.)  It "is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory or injunctive relief against a school's action or policy."  *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000).  Accordingly, Plaintiffs lack standing to seek injunctive or declaratory relief.  Plaintiffs' limited response does not undermine this conclusion.

15

Plaintiffs first argue that they continue to have standing to request declaratory relief because "[a] declaratory judgment and injunction will cure the constitutional violations that caused Defendants to deny Plaintiffs their fundamental constitutional rights." (Doc. 46 at 19.)  While that may be the case, Plaintiffs' reliance on what can be characterized as a "net benefit" for future students does not obviate the need for a live case or controversy.  *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797–98 (9th Cir. 1999) ("If an action or claim loses its character as a live controversy, then the action or claim becomes 'moot,' and [the court] lacks jurisdiction to resolve the underlying dispute.")  While there are exceptions for mootness, *see id.* at 798, Plaintiffs have not argued any apply in this case.  Nor could they, as courts have consistently held that such exceptions generally do not apply to student-plaintiffs that have graduated.  *See id.* at 798–99.  On the other hand, Plaintiffs argue that "[i]t would make little sense if Plaintiffs were permitted to seek damages for violation of their fundamental constitutional rights, but unable to obtain a declaration that the policy is unconstitutional." (Doc. 46 at 20.)  However, the mere desire for a declaration does not provide a legal basis or jurisdiction to maintain an independent claim for declaratory relief.

Plaintiffs' claims for injunctive and declaratory relief are dismissed for lack of standing.  *See Cole*, 228 F.3d at 1098; *Doe*, 177 F.3d at 798–99.

### B.    Damages

Plaintiffs also seek damages for the difference between the out-of-state tuition they paid and the in-state tuition they claim they were entitled to.  (Doc. 20 at 6–7; Doc. 28 at 31).  Defendants argue that Plaintiffs also lack standing to pursue these damages "because every plaintiff failed to qualify as a bona fide resident irrespective of the challenged Policy Provisions."  (Doc. 40 at 3.) According to Defendants, the professional student provisions were not the cause of any injury as "each Plaintiff failed to establish legal ties to Montana, sever legal ties to their previous domicile, or demonstrate an intent to make Montana home when they were here."  (*Id.*)  The issue here is whether Defendants can now look to reasons that denial would be appropriate that may not have been relied on during the underlying status determination.  According to Plaintiffs, "the Constitution is not so infirm that it allows post-denial litigation to cure a denial of Due Process, Equal Protection and the Right to Travel."  (Doc. 46 at 13.)  Thus, "Defendants cannot cure their course of conduct years ago[] today with post-denial adversarial litigation facts."  (*Id.*)  Ultimately, while Defendants pose this argument as one of standing, it is intertwined with the merits of Plaintiffs' claim, i.e., whether the alleged violation of their constitutional rights caused their damages.  Consequently, summary judgment is denied on Plaintiffs' damages claims based on Defendants' standing argument.

17

### C.    Hagan

Finally, as it relates to standing, Defendants argue that Plaintiff Hagan specifically lacks standing because he never applied for reclassification.  (*See* Doc. 32-10 at 34.)  Courts have consistently held that "a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."  *Madsen v. Boise St. Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (holding a student lacked standing to challenge handicap parking permit policy because he never applied for a permit).  This formal application requirement may be overcome, however, if Hagan's situation "falls within that small class of cases where a formal application is unnecessary on the ground of futility."  *Id.* at 1222; *see Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) ("We have consistently held that standing does not require exercises in futility."). This presents a close question here because, as argued by Plaintiffs, a nonresident professional student that read the professional student provisions would likely assume that he or she could not qualify as a resident once school began under the Policy's plain terms.  (*See* Doc. 15-1 at 3 ("An out-of-state student admitted to a professional degree program is not eligible for reclassification as an in-state resident and shall remain classified as an out-of-state student for the duration of the student's enrollment in the professional program.").)

The questioned Policy also includes several fact-dependent exceptions, such as potential military service, location of high school attended, and whether the student or a spouse had a full-time job in Montana prior to matriculation.  (*See id.* at 4–5.)  These exceptions temper the absolute language in the professional student provisions.  Consistently, a finding that Hagan has standing assumes that Hagan correctly interpreted the policy provisions, no exceptions applied, and Defendants would have relied solely on the irrebuttable presumption in denying his request for reclassification.  Such a finding assumes too much.  *See Friery v. L.A. Unified Sch. Dist.*, 448 F.3d 1146, 1150 (9th Cir. 2006) ("[T]hese [assumed] facts represent the quintessence of conjecture and speculation—realms where [a court's] jurisdiction to entertain suit may cease.").  Accordingly, Hagan too lacks standing.

## II.    Merits

To prevail a claim under § 1983, a plaintiff must show: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of State law." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  Here, Plaintiffs allege Defendants' tuition scheme violates their rights to due process and equal protection under the Fourteenth Amendment, as well as their right to travel, *see Zobel v. Williams*, 457 U.S. 55, 66–67 (1982) (Brennan, J., concurring) (recognizing a constitutional right to travel despite the fact there is "no explicit mention in the

Constitution").  Specifically, Plaintiffs challenge the twelve-month waiting period, the provision regarding financial dependence on parents, credit load presumption, and the disproportionate costs between in-state and out-of-state tuition rates.  And, for the crux of their case, Plaintiffs separately challenge the professional student provisions.  In response, Defendants maintain that the professional student provisions, as well as the other features of their tuition regime, are constitutional as applied to Plaintiffs.  Because Defendants are correct, summary judgment is granted in their favor.[3]

## A.    Other Residency Provisions

Plaintiffs claim that the Policy's twelve-month waiting period, financial dependence rules, and credit load presumptions violate the Equal Protection and Due Process Clauses.  Because these rules do not implicate a fundamental right or a suspect class, rational basis review applies.  *See Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) ("[A] classification neither involving fundamental rights not proceeding along suspect lines is accorded a very strong presumption of validity.").  Under rational basis review, Plaintiffs' challenges lack merit.

### 1.    Twelve-Month Waiting Period

---

[3] In light of this conclusion, the Court does not reach Defendants' argument that Plaintiffs have failed to identify any specific actions taken by any of Defendants other than Commissioner Christian that resulted in constitutional injury.

The Policy provides that a student may be classified as in-state only after "providing documentation showing that the person has been domiciled in Montana for at least 12 consecutive months." (Doc. 15-2 at 1; *see* Doc. 15-1 at 1.) Proving domicile requires students to "establish legal ties to Montana" by acquiring a Montana driver's license, registering to vote in Montana, or registering a motor vehicle in Montana "at least 12 consecutive months before the term for which the person seeks in-state status." (*Id.*) As argued by Defendants, *Vlandis* itself recognized states could impose a "reasonable durational residency requirement." 412 U.S. at 452. Plaintiffs present no argument or evidence to undermine that conclusion here. Summary judgment is granted in favor of Defendants as to this claim.

### 2. Financial Dependence on Parents

Plaintiffs next challenge the Policy's rules for students who are financially dependent on nonresident sources. (*See* Doc. 1 at ¶ 34.) Under the Policy, financially dependent students can generally qualify as in-state students only if they and their parents can "demonstrate domicile in Montana" by registering to vote in Montana, registering their vehicle in Montana, and obtaining a Montana driver's license. (Doc. 15-2 at 1; *see also* Doc. 15-1 at 1 (allowing student to make showing why lack of financial independence from nonresident parent should not be determinative.) As argued by Defendants, California has similar rules that have

21

been upheld, *see Markowitz v. Univ. of Cal.*, 2002 WL 31428619, at *8 (Cal. App. 2002) (upholding financial independence requirements in face of a right to travel and privacy challenge), so long as the criteria is tailored to preserve the state's legitimate interest in providing the subsidy of lower tuition to bona fide residents. *See Vlandis*, 412 U.S. at 453–54. Here, the focus is on the contribution to the tax base. *See Markowitz*, 2002 WL 31428619, at *6 ("[A] state has a substantial interest in limiting its tuition subsidies to residents who contribute to its tax base."). If a student has a job and pays Montana taxes, the Policy permits that student to argue that his or her financial dependence should not be determinative of residency. Summary judgment is granted in favor of Defendants as to this claim.

### 3.    Disproportionate Tuition Scheme

Plaintiffs also claim that the tuition discount for bona fide Montana residents is unconstitutionally disproportionate to the amount of taxes bona fide Montana residents pay. (*See* Doc. 1 at ¶ 27.) Other than citing to the tuition amounts, Plaintiffs present no evidence to this effect. On the other hand, Defendants argue, Montana has a substantial interest in preserving the benefit of affordable education for its residents and the Constitution permits it to do so. *See Martinez v. Bynum*, 461 U.S. 321, 333 (1983). Summary judgment is granted in favor of Defendants as to this claim.

### 4.    Credit Load Presumption

Plaintiffs next argue that the Policy's "credit load presumptions" are unconstitutional. (Doc. 1 at ¶¶ 35, 37, 38.) Because the Court previously dismissed Plaintiffs' facial challenge on this ground, (*see* Doc. 20 at 13), only their as-applied challenge remains. "Plaintiffs have not presented any evidence that the Policy's credit load presumptions were applied irrebuttably against them—or anyone else for that matter." (Doc. 40 at 35.) Summary judgment is therefore granted in favor of Defendants as to this claim.

### C.    Professional Student Provisions

Plaintiffs primarily challenge the professional student provisions, which they argue violate their due process and equal protection rights, as well as their right to travel. All three challenges lack merit.

### 1.    *Vlandis* Claim –  Due Process

The heart of this case lies in Plaintiffs' claim that the professional student provisions violate their due process rights as outlined in *Vlandis*. However, the undisputed record shows that Defendants did not apply the professional student provisions to Plaintiffs irrebuttably. Rather, Plaintiffs' requests for reclassification were denied based on Defendants' assessment of the totality of the facts surrounding their individual actions under the Policy as a whole.

### a.    Qualified Immunity

Defendants first argue that they are entitled to qualified immunity for any

putative *Vlandis* claim because the law in this area is not clearly established.

"Qualified immunity attaches when an official's conduct 'does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v.*

*Luna*, 577 U.S. 7, 11 (2015)). "A clearly established right is one that is sufficiently

clear that every reasonable official would have understood that what he is doing

violates that right." *Mullenix*, 577 U.S. at 11 (internal quotation marks and

citations omitted). "[Q]ualified immunity protects all but the plainly incompetent

or those who knowingly violate the law." *City of Tahlequah, Oklahoma. v. Bond*,

595 U.S. 9, 12 (2021) (internal quotation marks omitted). "The dispositive

question is 'whether the violative nature of *particular* conduct is clearly

established.'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731,

742 (2011)). The plaintiff "bears the burden of showing that the rights allegedly

violated were clearly established." *Vos v. City of Newport Beach*, 892 F.3d 1024,

1035 (9th Cir. 2018) (internal quotation marks and citations omitted). While the

law does "not require a case directly on point . . . existing precedent must have

placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S.

at 12 (quoting *Ashcroft*, 563 U.S. at 741). The Supreme Court "has repeatedly told

courts—and the Ninth Circuit in particular—not to define clearly established law at

24

a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal

quotation marks and citations omitted). If a court finds that an official is entitled to

qualified immunity, the court need not assess whether the official's conduct was

constitutional. *See Pearson v. Callahan*, 555 U.S. 223, 245 (2009).

Defendants argue that they are entitled to qualified immunity because the

professional student provisions do not violate clearly established law. More

specifically, Defendants argue that "*Vlandis* has been eroded since 1975, and most

federal courts treat its strict 'irrebuttable presumption' rule as having been

overruled." (Doc. 40 at 16.) Defendants rely on the district court's discussion in

*Black v. Snow*, 272 F. Supp. 2d 21 (D.D.C. 2003), to argue that *Vlandis*'s

irrebuttable presumption "has been essentially moribund," *id.* at 30, since the

Supreme Court decided *Weinberger v. Salfi*, 422 U.S. 749 (1975), two years later.

While Defendants are indeed correct that the years have been hard on *Vlandis*,

even so they are not entitled to qualified immunity.

"[A] State has a legitimate interest in protecting and preserving the quality

of its colleges and universities and the right of its own bona fide residents to attend

such institutions on a preferential tuition basis." *Vlandis*, 412 U.S. at 452–53.

States may therefore "establish reasonable criteria for in-state status as to make

virtually certain that students who are not, in fact, bona fide residents of the State,

but who have come there solely for educational purposes, cannot take advantage of

the in-state rates." *Id.* at 453–54.  But a state university's "permanent and

irrebuttable presumption of nonresidence" violates due process "because it

provides no opportunity for students who applied from out of State to demonstrate

that they have become bona fide . . . residents." *Id.* at 452–53.  Thus, "a state

violates due process where it creates a university tuition rate scheme that purports

to be concerned with residency, but then applies an irrebuttable presumption

precluding those 'seeking to meet its test of residency the opportunity to show

factors clearly bearing on the issue.'"  *Carlson v. Reed*, 249 F.3d 876, 881 (9th Cir.

2001) (quoting *Salfi*, 422 U.S. at 771).  While residency must be decided on the

"particular facts" of each case, the Supreme Court has recognized the following

"relevant criteria" for determining residential status: "year-round residence, voter

registration, place of filing tax returns, property ownership, driver's license, car

registration, marital status, vacation employment, etc."  *Vlandis*, 412 U.S. at 454.

Regardless of how much backpedaling courts have done since 1973, *Vlandis*

has not been overruled.  *See D'Angelo v. Craft*, 294 F. App'x 254, 256 (9th Cir.

2008) (Reinhard, J., dissenting) (unpublished) ("Because the right to be free from

an irrebuttable presumption of non-residency has been clearly established since

*Vlandis* was decided over 30 years ago, defendants are not entitled to qualified

immunity.").  This legal reality is difficult for Defendants to overcome because this

case, unlike *Black*, challenges presumptions in a university residency classification

system, the very challenge at issue in *Vlandis*.  Moreover, Defendants themselves

seem to recognize that to the extent *Vlandis* was undermined by *Salfi*, *Carlson*

articulated a clear, surviving standard.  Even if Defendants are correct in arguing

that Plaintiffs' claims fail under this standard, (*see* Doc. 40 at 21–22), that merely

raises the question of whether Defendants' conduct violated that standard, not

whether the law was clearly established.  Defendants are not entitled to qualified

immunity on Plaintiffs' *Vlandis* claim.

### b.    Constitutionality

Plaintiffs argue that they have a Fourteenth Amendment due process right to

attain residency while in student status.  There is no question that both versions of

the Policy—old and new—do not permit this.  Under the old Policy language, a

student could challenge the school's residency classification, but only so long as he

or she did so prior to matriculation.  (Doc. 15-1 at 4–5.)  Under the new Policy

language, a student can challenge his or her residency classification at any time,

but must show facts in existence prior to matriculation, i.e., that he or she

"maintained a primary residence in Montana for at least 12 consecutive months

immediately before the student's first admitted semester."  (Doc. 15-2 at 4.)  This

is problematic for Defendants because, as explained above, due process disallows

an "irrebuttable presumption precluding those 'seeking to meet [a] test of residency

the opportunity to show factors clearly bearing on the issue.'" *Carlson*, 249 F.3d

at 881 (quoting *Salfi*, 422 U.S. at 771).

But Plaintiffs face a fundamental problem: while Defendants relied on the

professional student provisions in denying reclassification, Defendants also

considered whether each individual student would qualify under the residency

requirements applicable to all other students. (*See generally*, Doc. 37-1 at 15–39

(denial letters); *see also* Doc. 32-19 at 3 (Niman Denial); Doc. 34-8 (Starr Denial);

Doc. 34-9 (Ward Denial); *see also* Doc. 34-1 at 97 (Christian Depo.).)   As

explained by Commissioner Christian in his deposition, while the prior Policy did

not on its face permit reclassification while in student status, "the policy also

describes a right of appeal to the commissioner's office, and that right of appeal

gives us some leeway to look at the totality of an individual's circumstances and

make a decision." (Doc. 34-1 at 7, 15, 19–20; *see id.* at 113 ("[P]art of the appeals

process is to make exceptions where they're reasonable.").)   The Policy

presumption was therefore "a factor of the decision, not the only [factor]." (*Id.* at

8, 11–12, 30, 65–67, 86.)   Thus, as explained by Commissioner Christian, the

denials "would cite all of the reasons [Defendants] thought that [a student] would

remain classified as a nonresident," including the failure to meet the requirements

of the professional student provisions. (*Id.* at 15.)   Ultimately, Commissioner

Christian testified in his deposition: "I think the policy absolutely allowed students

28

to overcome any presumptions that existed, and students did along the way." (*Id.* at 17, 34–36, 72, 85, 92; *see also id.* at 75 (discussing current Policy presumption); *see also* Doc. 43 at ¶ 13 ("While the professional student provisions make it challenging for certain nonresident professional students to be reclassified as in-state students, I never apply them irrebuttably."); Doc. 43-1 (granting a law student request for reclassification).)

The one plaintiff that comes close to showing the application of an irrebuttable presumption is Bennett. Bennett is the only plaintiff that fully severed all ties with his former state of residence, South Dakota, and took all affirmative steps to establish residence in Montana (such as getting a driver's license, paying taxes, registering to vote, registering a car) at least twelve months before he sought reclassification. (*See* Doc. 37-1 at 22.) However, even in that case, Bennett failed to overcome the presumption that he came to Montana primarily for educational purposes. (*See id.* at 23; Doc. 15-1 at 4.) While that presumption may be difficult to rebut, it is not impossible. (*See, e.g.*, Doc. 43-1 (Commissioner granting a reclassification request following appeal by a law student in 2024).) In the absence of showing that a presumption was actually applied irrebuttably, Plaintiffs' fail to establish a *Vlandis* violation.

Another problem for Plaintiffs is what they believe the standard should be in the absence of the professional student provisions. The argument seems to be that

Defendants can only apply the presumptions and rules set in Montana Code Annotated § 20–25–503, specifically subsection (4), which states that "[a] new domicile is established by a qualified person if the person is physically present in Montana with no intention to acquire a domicile outside of Montana." However, as indicated by Commissioner Christian, § 20–25–503 is not inherently inconsistent with Defendants' residency policy insofar as the purpose of the policy, and the professional student provisions in particular, is to apply objective criteria to assess that intent. (*See* Doc. 34-1 at 89–90; *see* Doc. 43 at ¶ 6.) Thus, contrary to Plaintiffs' position, they would not automatically be granted in-state status if this Court set aside the professional student provisions. Plaintiffs would still be required to prove residency under the standard that applies to all other students. And, as argued by Defendants, Plaintiffs' wavering commitment to their Montana residency would make a finding of residency under the more general Policy language unlikely.

Because the undisputed facts show that Plaintiffs were not subjected to an irrebuttable policy presumption in contravention of *Vlandis*, their as-applied due process claim fails as a matter of law.

### 2.    **Equal Protection**

Plaintiffs do not separately argue their equal protection claim. Even so, such a claim faces two fatal flaws: (1) Defendants have presented evidence that

professional students are not similarly situated with other university students, (*see* Doc. 34-1 at 24–25; Doc. 43 at ¶¶ 8–12), and (2) Plaintiffs have not negated "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 630 (9th Cir. 2024) (internal quotation marks and alteration omitted). Thus, summary judgment is granted as to Plaintiffs' equal protection claim.

### 3. Right to Travel

Finally, Plaintiffs argue that the Policy denies them the right to travel. However, to extent this claim is separate from their due process or equal protection claims, it was not pled. (*See* Doc. 1 at 11.) It can be rejected on that ground alone. Regardless, Defendants persuasively argue that it fails for same reason as Plaintiffs' durational residency requirement claim. (*See* Doc. 40 at 31 n.3.)

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Plaintiffs' motion for partial summary judgment (Doc. 36) is DENIED and Defendants' motion for summary judgment (Doc. 39) is GRANTED. The Clerk is directed to enter judgment consistent with this Order and close the case.

DATED this __6__ day of January, 2025.

13:22 P.M,

Donald W. Molloy, District Judge
United States District Court